UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| MAURICE MUHAMMAD, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:24-cv-5543 |
| | : | |
| NATIONAL ASSOCIATION OF | : | |
| REALTORS (NAR), *et al.*, | : | |
| Defendants. | : | |

_____

**O P I N I O N**
**Motion to Dismiss, ECF No. 54 – Granted**

**Joseph F. Leeson, Jr.**                                      **July 31, 2025**
**United States District Judge**


## I.        INTRODUCTION

This case involves claims by a Pennsylvania real estate professional against realtor

associations for monopolization and discrimination regarding the multiple listing service (MLS),

which is an online database available to licensed agents and brokers to assist clients in selling

their homes.  Defendants have moved to dismiss the Second Amended Complaint for failure to

state a claim.  For the reasons set forth below, the Motion is granted.

## II.       BACKGROUND

### A.        Procedural History

On October 16, 2024, Plaintiff Maurice Muhammad initiated the above-captioned action

pro se against Defendants National Association of Realtors ("NAR"), Pennsylvania Association

of Realtors ("PAR"), and Greater Lehigh Valley Realtors ("GLVR")[1].  *See* ECF No. 2.  Shortly

---
[1]        The Complaint, First Amended Complaint, and Second Amended Complaint name the
defendant as "Greater Lehigh Valley Realtors Multiple Listing Service," but it is clear from all

thereafter, Muhammad filed an Amended Complaint against NAR, PAR, and GLVR, as well as eleven individuals, including Allyson Lysaght and Justin Porembo. *See* ECF No. 8. Defendants moved to dismiss, to which Muhammad responded by moving to amend the complaint. *See* ECF Nos. 27, 35. On February 6, 2025, this Court granted Muhammad's Motion to Amend the Complaint and dismissed the Motion to Dismiss without prejudice. *See* ECF No. 47. The Order advised Muhammad that he "shall identify all defendants in the caption of the amended complaint in addition to identifying them in the body of the amended complaint and shall state the basis for his claims against each defendant." *Id.* It further warned Muhammad that "[w]hen drafting his amended complaint, [he] should be mindful of Defendant's arguments in the Motion to Dismiss and should include any additional allegations to address all alleged deficiencies set forth in the Motion [because] . . . he will not be given further leave to amend." *Id.*

On February 23, 2025, Muhammad filed a Second Amended Complaint naming as defendants: NAR, PAR, GLVR, Allyson Lysaght, Justin Porembo, and John Does 1-10.[2] *See* Sec. Am. Compl., ECF No. 49. He brings claims under Sections 1 and 2 of the Sherman Antitrust Act, the Fair Housing Act ("FHA"), 42 U.S.C. §§ 1981 and 1983 for civil rights violations of discrimination, procedural and substantive due process, and equal protection, and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See id.* Defendants have filed a Motion to Dismiss, which is fully briefed. *See* Mot., ECF No. 54; Pl.'s Resp., ECF No. 55; Reply, ECF No. 56; Pl.'s Supp. Resp., ECF No. 60.

---

filings by Defendants, as well as Muhammad's most recent filing, *see* ECF No. 60, that the correct name of this defendant is "Greater Lehigh Valley Realtors" ("GLVR"). This Opinion therefore refers only to GLVR.

[2]     In an Order dated February 26, 2025, this Court directed the Clerk of Court to terminate from the docket the individual defendants that were not named in the Second Amended Complaint. *See* ECF No. 52.

B.    **Factual Allegations**[3]

Muhammad has been a licensed real estate professional since 2000 and paid member of

the NAR.  *See* Sec. Am. Compl. ¶ 3.[4]  NAR is a trade association governing real estate

professionals nationwide; PAR is a state affiliate of the NAR; GLVR is the regional association;[5]

and Lysaght and Porembo are "executives."  *See id.* ¶ 4.

As a real estate professional it was "essential" for Muhammad to have MLS access.  *See*

*id.* ¶¶ 10, 14.  Such access was limited to members of NAR.  *See id.*  NAR requires members to

abide by a Code of Ethics and to pay membership fees.  *See id.* ¶¶ 26, 45.  Such fees are

allegedly "excessive."[6]  *See id.* ¶¶ 12, 37.  Such fees made it financially impossible for

Muhammad to continue working as a real estate professional.  *See id.* ¶ 37.  Muhmmad alleges

that requiring NAR membership restricts competition, constitutes illegal monopolization, and

violates Pennsylvania unfair trade practices law.  *See id.* ¶¶ 9, 37, 45, 48, 133.

Muhammad also alleges that many real estate professionals, especially minority-owned

businesses, face financial barriers and are forced out of the industry due to the "burdensome

costs and restrictive requirements."  *See id.* ¶ 15.  He alleges that Defendants[7] "selectively

enforced their rules based on race" and that minority real estate professionals "were subjected to

disparate enforcement of ethics complaints and penalties[, w]hile white real estate professionals

---

[3]    There are numerous conclusory and legal allegations that are not accorded the presumption of truth, but have been included in this section to provide an understanding of Muhammad's claims.

[4]    The Second Amended Complaint repeats paragraphs 2-5 in the relief section, but all citations herein are to the first numbered paragraphs unless otherwise stated.

[5]    According to their website, the GLVR "is a trade association that represents over 3,000 real estate professionals throughout Lehigh, Northampton, and Carbon counties."  *See* https://www.greaterlehighvalleyrealtors.com/about/who-we-are/ (last accessed July 16, 2025).

[6]    Muhammad alleges that the GLVR also applied inconsistent fees and denied access to MLS data.  *See* Sec. Amend. Compl. at ¶ 11.

[7]    Unless otherwise stated, all allegations are made against "Defendants" collectively.

were given leniency for similar or more serious offenses." *See id.* ¶¶ 22, 25, 26.  Muhammad

alleges that he was "unfairly targeted in disciplinary proceedings" and that Defendants

discriminated against him "based on race by imposing harsher penalties than similarly situated

non-minority professionals." *See id.* ¶¶ 24-25, 28, 43.

Muhammad alleges that he "faced excessive penalties, unjust fees, and was eventually

coerced into almost relinquishing agents license." *See id.* ¶ 22.  Defendants charged him "with

ethics violations even after the original complainant declined to appear or provide evidence" and

allegedly denied him a fair hearing.  *See id.* ¶¶ 30, 33-34.  Muhammad alleges that "Defendants

applied rules and penalties in an inconsistent and retaliatory manner to punish [him] for speaking

out against discriminatory practices." *See id.* ¶ 34.  His discrimination complaints were ignored,

while complaints against Muhammad were "aggressively pursued." *See id.* ¶ 39 (alleging a

pattern of biased enforcement).  He alleges that "Defendants used coercive tactics to punish

[him] for speaking out against industry corruption, including the intentional imposition of vague

and arbitrary penalties to force him out of business, threatening to report him to state licensing

authorities for baseless reasons, damaging his professional reputation, refusing to reinstate [his]

membership and MLS access, despite him meeting all licensing and membership requirements."

*See id.* ¶ 40.  He suffered financial losses due to restricted MLS access and revoked license.  *See*

*id.* ¶ 49.

Muhammad alleges that "Defendants misrepresented their authority, falsely claiming they

had the power to revoke [his] real estate license" and forced "him to return it under duress." *Id.* ¶

38.  He alleges that they misrepresented the MLS by claiming that it was "optional, when in

reality, it [was] a mandatory requirement for professionals to conduct business . . . ." *Id.* ¶ 44.

He also alleges that Defendants publicly advertised the "MLS as an 'open and fair marketplace',

while internally maintaining barriers that prevent minority professionals from competing equally." *See id.* ¶ 42.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss, Rule 12(b)(6) - Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). This Court construes *pro se* pleadings liberally. *See Higgs v. AG of the United States*, 655 F.3d 333, 339 (3d Cir. 2011). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (holding that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that "a document integral to or explicitly relied upon in the complaint may be considered" (internal quotations omitted)). Courts may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The defendant bears the burden of demonstrating the plaintiff failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## B.    Sherman Act - Review of Applicable Law

### 1.    Section 1 of the Act

Section 1 of the Sherman Act prohibits contracts or conspiracies made "in restraint of trade or commerce." 15 U.S.C. § 1. "Although its language is broad, § 1 only prohibits unreasonable restraints of trade." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395 (3d Cir. 2015). "An antitrust plaintiff must plead the following two elements: (1) 'that the defendant was a party to a contract, combination . . . or conspiracy' and (2) 'that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.'" *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).

The first element requires "some form of concerted action, . . . in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315 (internal citations and quotations omitted). "Put more succinctly, '[t]he existence of an

agreement is the hallmark of a Section 1 claim.'"  *Id.* (quoting *Jacob Blinder & Sons, Inc. v. Gerber Prods. Co. (In re Baby Food Antitrust Litig.)*, 166 F.3d 112, 117 (3d Cir. 1999)).

Agreements may be between competitors (horizontal) or between firms at different levels of distribution (vertical).  *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

"To satisfy its burden at the pleading stage, a § 1 plaintiff may set forth either direct or circumstantial evidence suggesting that an agreement has taken place."  *Davis v. Hanna Holdings, Inc.*, No. 24CV2374, 2025 U.S. Dist. LEXIS 118128, at *16 (E.D. Pa. June 23, 2025).

"Direct evidence is explicit and requires no inferences to establish the proposition or conclusion being asserted," such as "a document or conversation explicitly manifesting the existence of the agreement in question."  *Id.* (internal quotations omitted) (*citing In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23).

"By contrast, where a plaintiff relies only on circumstantial evidence . . . the pleadings must include 'enough factual matter (taken as true) to suggest that an agreement was made,' and 'that discovery will reveal evidence" of that agreement.'"  *Davis*, 2025 U.S. Dist. LEXIS 118128, at *16-17 (quoting *Twombly*, 550 U.S. at 556).

Initially, there were two "complementary categories" of agreements in the antitrust analysis.  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  "In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality -- they are 'illegal per se.'"  *Id.*  Agreements that are *per se* unlawful can be "rejected after only a quick look."  *NCAA v. Alston*, 594 U.S. 69, 89 (2021).  "In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed."  *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692.

*See also Alston*, 594 U.S. at 81 ("Determining whether a restraint is undue for purposes of the Sherman Act presumptively calls for what we have described as a rule of reason analysis. That manner of analysis generally requires a court to conduct a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." (internal quotations and citations omitted)).  Courts also consider "its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable[; . . .] the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."  *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918).  A third test has developed over time.  "In addition to the traditional rule of reason and the per se rule, courts sometimes apply what amounts to an abbreviated or 'quick look' rule of reason analysis. The abbreviated rule of reason is an intermediate standard."  *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993).  This standard "applies in cases where per se condemnation is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character' of an inherently suspect restraint."  *Id. See also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (explaining that the "quick-look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained").

Under the second element of a § 1 claim, a practice is not an unreasonable restraint on trade if it "merely regulates and perhaps thereby promotes competition," but it is an unreasonable restraint if it "may suppress or even destroy competition."  *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918).

### a.    Tying Claims

"A tying arrangement that violates Section 1 is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at

least agrees that he will not purchase that product from any other supplier.'" *Kenney v. Am. Bd.
of Internal Med.*, 847 F. App'x 137, 142 (3d Cir. 2021) (quoting *N. Pac. Ry. Co. v. United States*,
356 U.S. 1, 5-6 (1958)). "The essential characteristic of a tying arrangement lies in the seller's
exploitation of its control over the tying product to force the buyer into the purchase of a tied
product that the buyer either did not want at all, or might have preferred to purchase elsewhere
on different terms." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 214 (3d Cir. 2005). "They are
unreasonable in and of themselves whenever a party has sufficient economic power with respect
to the tying product to appreciably restrain free competition in the market for the tied product
and a 'not insubstantial' amount of interstate commerce is affected." *N. Pac. Ry. CO.*, 356 U.S.
at 6.

A tying arrangement violates antitrust law when three criteria are met: (1) "the seller
must have power in the tying-product market;" (2) "there must be a substantial threat that the
tying seller will acquire market power in the tied-product market;" and (3) "there must be a
coherent economic basis for treating the tying and tied products as distinct." *Jefferson Par.
Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 37-40 (1984). The plaintiff "bears the burden of defining
the relevant product market." *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp.
3d 665, 697 (E.D. Pa. 2021). "To define the relevant market, [the courts] first consider the
extent to which Defendants' product is interchangeable with alternative products in the field.
The term '[i]nterchangeability' implies that one product is roughly equivalent to another for the
use to which it is put. It also means that while there might be some degree of preference for . . .
one [product] over the other, either would work effectively." *Mylan Pharm. Inc. v. Warner
Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 436 (3d Cir. 2016) (internal quotations and citations
omitted). A plaintiff must satisfy these elements under both the rule of reason and per se

analysis.  *See Carl Sandburg Vill. Condo. Asso. No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985).

Under the per se analysis, a plaintiff must prove: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992).  For the third required showing, "the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie."  *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 501 (1969).  This "can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?"  *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006), *cert. denied* 549 U.S. 1265 (2007).  A fourth element is sometimes imposed in the per se analysis: (4) the tying company has an economic interest in the sales of the tied product.  *See Venzie Corp. v. United States Mineral Prods. Co.*, 521 F.2d 1309, 1317 (3d Cir. 1975); *Carl Sandburg Vill. Condo. Asso. No. 1*, 758 F.2d at 207.  "[T]o succeed on a rule of reason claim the plaintiff must prove that the alleged tie 'unreasonably restrained competition.' . . . This burden 'necessarily involves an inquiry into the actual effect of the [challenged conduct] on competition [in the tied market].'"  *Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 519 (3d Cir. 1998) (quoting *Jefferson Par. Hosp. Dist. No. 2*, 466 U.S. at 29.

### 2.     Section 2 of the Act

Section 2 of the Sherman Act prohibits monopolization, conspiracies to monopolize, and attempted monopolization.  *See* 15 U.S.C. § 2.  A monopoly claim "has two elements: (1) the

possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "Monopoly power is the ability to control prices and exclude competition in a given market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007). A plaintiff may establish the first element with factual allegations of "direct evidence of supracompetitive prices and restricted output," or of indirect evidence that the defendant "ha[d] a dominant share in a relevant market[] and that significant 'entry barriers' protect that market." *Id.* at 307 (quoting *Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 381 (3d Cir. 2005)). "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom Corp.*, 501 F.3d at 307. "The second element the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." *Id.* at 308 (citing *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.*

If the monopolization claim is based on concerted action, a plaintiff must allege facts showing there was a conspiracy "between two or more distinct entities." *See McGary v. Williamsport Reg'l Med. Ctr.*, 775 Fed. Appx. 723, 730 (3d Cir. 2019). "Section 2 does not provide for a conspiracy to attempt to monopolize claim." *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700, 702 (E.D. Pa. 2007).

To prevail on an attempted monopolization claim under § 2, a plaintiff must allege facts showing that the defendant: (1) "engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993). "Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power." *Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332, 339 (3d Cir. 2018). For the first element, "[t]o determine whether conduct is anticompetitive, 'courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.'" *Id.* (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc)). For the second element, a "specific intent to monopolize" may be inferred from "anticompetitive or exclusionary conduct." *Id.* at 341 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39 (1985)). The third element "is typically one that is not resolved at the pleading stage unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law, the complaint should allege viable relevant markets." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir. 1995) (internal citations omitted); *Broadcom Corp.*, 501 F.3d at 318 (explaining that "dangerous probability" is a "a particularly fact-intensive inquiry" and "is a question of proximity and degree" (internal quotations omitted)). "[F]actors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered." *Broadcom Corp.*, 501 F.3d at 318.

### C.    Fair Housing Act (FHA) – Review of Applicable Law

"The Fair Housing Act ('FHA'), passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, *inter alia*, race, gender, and national origin." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005).  FHA claims tend to fall into three categories: (1) intentional discrimination/disparate treatment claims; (2) disparate impact claims; and (3) reasonable accommodation/modification claims.  *See Coyne v. Holy Fam. Apartments*, No. CV 19-4583, 2020 WL 2063475, at *5 (E.D. Pa. Apr. 29, 2020).

As relevant here, the FHA makes it "unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3606.  Section 3606 prohibits, *inter alia*:

> (1) Setting different fees for access to or membership in a multiple listing service because of race, color, religion, sex, handicap, familial status, or national origin.
> (2) Denying or limiting benefits accruing to members in a real estate brokers' organization because of race, color, religion, sex, handicap, familial status, or national origin.
> (3) Imposing different standards or criteria for membership in a real estate sales or rental organization because of race, color, religion, sex, handicap, familial status, or national origin.
> (4) Establishing geographic boundaries or office location or residence requirements for access to or membership or participation in any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, because of race, color, religion, sex, handicap, familial status, or national origin.
> (5) Conditioning access to brokerage services on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.
> (6) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that has the effect of discouraging or denying access to brokerage services.

24 C.F.R. § 100.90(b).  To make a prima facie case of discrimination/disparate treatment, the plaintiff allege facts showing: (1) he is a member of a protected class; (2) he was qualified to participate in a business related to the buying and selling of houses; (3) he was limited in his access to multiple-listing services by the defendant; and (4) others not in the protected class were given greater access to multiple-listing services by the defendant.  *See Anwah v. JRHBW Realty, Inc.*, No. CV-05-J-361-S, 2006 U.S. Dist. LEXIS 111955, at *22-23 (N.D. Ala. Mar. 28, 2006). To state a disparate impact claim, the plaintiff "must allege that a defendant's policy has a disparate impact on a protected class."  *Dew v. S. Columbia Terrace, LLC*, 854 F. App'x 460, 462 (3d Cir. 2021). *See also Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 466-67 (3d Cir. 2002) ("In order to make a prima facie case of disparate impact under the FHAA, the plaintiff must show that the [defendant's] action had a greater adverse impact on the protected group . . . than on others.").

### D.    Section 1981 Claims – Review of Applicable Law

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To state a discrimination claim under § 1981, a plaintiff must allege facts showing: (1) the plaintiff is a member of a racial minority; (2) the defendant(s) had an intent to discriminate based on race; and (3) the discrimination concerned one or more of the activities enumerated in § 1981.  *See Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).

E.    Section 1983 Claims - Review of Applicable Law

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The first step for the court analyzing a claim under § 1983 "is to identify the exact contours of the underlying right said to have been violated." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). The court must determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *See Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Id.*). Section "1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotations omitted). The court must also determine whether a defendant is acting under color of state law, i.e., whether the defendant is a state actor, which depends on whether there is "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted). The Third Circuit has

> outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (cleaned up). Additionally, a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual

knowledge and acquiescence, however, must be made with appropriate particularity." *Id.*

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the

Constitution." *Iqbal*, 556 U.S. at 676.

### F.    Due Process Claims – Review of Applicable Law

"The touchstone of due process is the protection of the individual against arbitrary action

of the government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

### 1.    Substantive Due Process

To state a claim for a violation of substantive due process rights, a plaintiff must show:

(1) the interest at issue is protected by the substantive due process clause; and (2) "the

government's deprivation of that protected interest shocks the conscience." *Kane v. Barger*, 902

F.3d 185, 192 (3d Cir. 2018).  As to the second element, the defendant's conduct "must exceed

both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness

that indeed 'shocks the conscience.'" *Miller v. City of Phila.*, 174 F.3d 368, 375-76 (3d Cir.

1999).  "'[O]nly the most egregious official conduct' violates substantive due process." *J.R. v.

Lehigh Cty.*, 534 F. App'x 104, 108 (3d Cir. 2013) (quoting *Miller*, 174 F.3d at 375 ("To

generate liability, executive action must be so ill-conceived or malicious that it 'shocks the

conscience.'")).

### 2.    Procedural Due Process

To state a claim for deprivation of procedural due process rights, a plaintiff must allege:

(1) the deprivation of an individual interest that is encompassed within the Fourteenth

Amendment's protection of "life, liberty, or property," and (2) the procedures available did not

provide "due process of law." *See Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir.

2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  As to the second element, the

"fundamental requirement of due process is the opportunity to be heard at a meaningful time and

in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Additionally, to

assert a procedural due process claim against a state actor, the plaintiff "must, at a minimum,

prove recklessness or 'gross negligence' and in some instance may be required to show a

'deliberate decision to deprive' the plaintiff of due process.'" *Mulholland v. Gov't Cty. of Berks*,

706 F.3d 227, 238 (3d Cir. 2013) (quoting *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20

F.3d 1250, 1277 (3d Cir. 1994)).  A "state may cure a procedural deprivation by providing a later

procedural remedy." *Bonilla v. City of Allentown*, 359 F. Supp. 3d 281, 297 (E.D. Pa. 2019)

(referencing *Marchionni v. SEPTA*, No. 98-6491, 2000 WL 730348, at *2 (E.D. Pa. June 7,

2000)).

### G.    Equal Protection Claims- Review of Applicable Law

To state a claim for a violation of the Equal Protection Clause of the Fourteenth

Amendment, the plaintiff must establish: (1) the existence of purposeful discrimination; and (2)

the defendant's personal involvement in this discrimination. *See Shuman v. Penn Manor Sch.

Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citing *Andrews v. Philadelphia*, 895 F.2d 1469, 1478

(3d Cir. 1990)).  The plaintiff must show that any disparate treatment was based upon his

membership in a protected class (race, gender, etc.). *See id.*  "Personal involvement exists where

the defendant engaged in the purposeful discriminatory conduct himself or knowingly

acquiesced to it." *Dowling v. Commonwealth Liquor Control Bd.*, No. 88-7568, 1992 U.S. Dist.

LEXIS 17438, at *20-21 (E.D. Pa. Oct. 26, 1992).

**H.      Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) - Review of Applicable Law**

Following the amendment of the UTPCPL statute "in 1997 to add the word 'deceptive' alongside 'fraudulent[, c]ourts in this district are divided as to whether or not the catch-all provision still requires that the elements of common-law fraud be satisfied." *Ries v. Curtis*, No. 13-1400, 2013 U.S. Dist. LEXIS 88558, at *18-19 (E.D. Pa. June 24, 2013).  Some courts have concluded that "[t]o bring a claim of fraud under the UTPCPL, Pennsylvania state court precedent requires Plaintiffs to meet the elements of common law fraud.  Under Pennsylvania law, common law fraud requires: (1) a misrepresentation, (2) material to the transaction, (3) made falsely, (4) with the intent of misleading another to rely on it, (5) justifiable reliance resulted, and (6) injury was proximately caused by the reliance." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 619 (E.D. Pa. 2010) (citations omitted). *See also Heller v. Shaw Indus.*, No. 95-7657, 1997 U.S. Dis. LEXIS 12399, at *65-66 (E.D. Pa. Aug. 15, 1997).  Under this approach, a "plaintiff must plead a claim of a violation of the UTPCPL with the same specificity as a claim for common-law fraud." *Grant v. Kingswood Apartments*, No. 01-1523, 2001 U.S. Dist. LEXIS 15815, at *12 (E.D. Pa. Oct. 2, 2001).  Alternatively, "[u]nder the deceptive practice theory employed in *Sacks*, a Plaintiff must demonstrate (1) defendant made a misrepresentation or engaged in deceptive conduct—conduct that is likely to deceive a consumer acting reasonably under similar circumstances, (2) he justifiably relied on defendant's misrepresentation or deceptive conduct, and (3) he was damaged by his justifiable reliance on defendant's alleged misrepresentation or deceptive conduct." *Ries*, 2013 U.S. Dist. LEXIS 88558, at *19 (citing *Sacks v. DJA Auto.*, No. 12-284, 2013 U.S. Dist. LEXIS 7824, at *19 (E.D. Pa. Jan. 18, 2013)).  "[T]he UTPCPL, 73 Pa. Stat. Ann. § 201-9.2, requires plaintiffs to prove justifiable reliance even in cases involving the post-1996 catchall provision.  Therefore, in order

to adequately plead their claim the [plaintiffs] must at least allege facts from which plausible inferences of deceptive conduct and justifiable reliance thereon can be drawn." *Kemezis v. Matthews*, 394 F. App'x 956, 959 (3d Cir. 2010) (internal citation omitted). The plaintiff "must prove justifiable reliance affirmatively," it may not be presumed. *See Hunt v. United States Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008). "Hypothetical losses cannot be the basis of a claim under the UTPCPL's private right of action." *Ober v. Ocwen Fin. Corp.*, No. 1:19-CV-01171, 2020 U.S. Dist. LEXIS 67397, at *9 (M.D. Pa. Apr. 16, 2020).

## IV.    ANALYSIS

### A.    Muhammad fails to state a claim against the individual defendants.

Muhammad fails to state a claim against the individual Defendants Allyson Lysaght and Justin Porembo. Aside from naming them in the case caption and identifying them as "executives," without any allegation as to their employer(s), *see* Sec. Am. Compl. ¶ 4, there are no allegations of any action or inaction attributed to them.[8] In fact, there is no other mention of Porembo in the Second Amended Complaint. *See generally id.* He must therefore be dismissed. *See Strunk v. Wells Fargo Bank, N.A.*, 614 F. App'x 586, 589 n.4 (3d Cir. 2015) (concluding that the district court correctly dismissed claims against the individual defendants named only in the case caption). The one other reference to Lysaght states: "Defendants discriminated against Plaintiff based on race by imposing harsher penalties than similarly situated non-minority professionals and allowing a Director to use race as a tool for personal grievances. Allyson Lysagt [sic] Via Email." *See id.* ¶ 24. This allegation in insufficient because it refers to

---

[8]    When granting Muhammad leave to file the Second Amended Complaint, this Court advised Muhammad that he "shall identify all defendants in the caption of the amended complaint *in addition to identifying them in the body of the amended complaint and shall state the basis for his claims against each defendant.*" *See* ECF No. 47 (emphasis added).

Defendants collectively and is conclusory. *See Iqbal*, 556 U.S. at 678 (holding that conclusory allegations do not suffice to state a claim); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) ("Conclusory, collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases."); *Taylor v. Northampton Cty.*, No. 5:24-cv-1411, 2025 U.S. Dist. LEXIS 105606, at *17-19 (E.D. Pa. June 4, 2025) (dismissing discrimination claims because the allegations were conclusory and made against the defendants collectively); *Blackstone v. Dauphin Cty. Court of Common Pleas*, No. 1:22-cv-01630, 2024 U.S. Dist. LEXIS 159911, at *5-6 (M.D. Pa. Sep. 5, 2024) (dismissing § 1983 claims where none of the individual defendants were referenced in the body of the complaint and all allegations were made against "Defendants" collectively); *Kemezis*, 2008 U.S. Dist. LEXIS 100459, at *6-7 (dismissing UTPCPL claim because the plaintiffs "simply make conclusory allegations that 'Defendants' collectively engaged in fraudulent or deceitful acts"). For these reasons and those more fully set forth below as to each claim, Defendants Allyson Lysaght and Justin Porembo are dismissed.

B.    **The Sherman Act claims are dismissed.**[9]

1.    **Section 1**

"Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade .

. . but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is

whether the challenged anticompetitive conduct stem[s] from independent decision or from an

agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal quotations and citations

omitted). Muhammad's bare and conclusory allegations that Defendants had "price-fixing

arrangements" and "engaged in anticompetitive practices by . . . imposing excessive fees and

fines to eliminate competition and engaging in steering to maintain an unfair market advantage,"

*see* Am. Compl. ¶¶ 12, 16, are insufficient to plead an agreement or conspiracy to engage in such

conduct. *See Twombly*, 550 U.S. at 556 (holding that "an allegation of parallel conduct and a

bare assertion of conspiracy will not suffice" to state a § 1 claim); *Kerwin v. Parx Casino*, 802 F.

App'x 723, 725-26 (3d Cir. 2020) (determining that the plaintiff's vague conspiracy allegations

---

[9]    It is not entirely clear from the Second Amended Complaint whether Muhammad has standing to pursue a Sherman Act claim. However, at this early stage of the proceedings, the request to dismiss for lack of standing is denied because his allegations that Defendants refused to "reinstate" his membership and revoked his license, and that he suffered "financial losses" due to the tying arrangement, *see* Sec. Am. Compl. ¶¶ 40, 48, 49, suggest an injury in fact. *See Bogus v. Am. Speech & Hearing Asso.*, 582 F.2d 277, 285 (3d Cir. 1978) ("A direct purchaser who demonstrates a legitimate economic or business interest in purchasing a desirable or unique tying product or service and who is thereby compelled to purchase [] a tied product or service has standing to challenge the legality of the tie-in."). *But see Young v. Lehigh Corp.*, No. 80 C 4376, 1989 U.S. Dist. LEXIS 11575, at *48 (N.D. Ill. Sep. 26, 1989) ("Although the plaintiff may have suffered an 'injury' in paying for club membership that he did not need or want, he did not suffer an 'antitrust injury' and, therefore, does not have standing to assert an antitrust tying claim."); *Eytalis*, 2025 U.S. Dist. LEXIS 140578, at *11-12 (concluding that the plaintiff, a real estate broker, alleged "her own injuries arising from Defendants' [NAR, Texas Association of Realtors, and Wichita Falls Association of Realtors] rules concerning non-member annual dues for agents and requirements that she either pay dues for inactive agents or no longer serve as their sponsoring broker," but does not "connect this injury to a negative impact on competition in any relevant market").

that the defendants' refused to do business with him did not demonstrate the requisite concerted action).  Aside from referring to a price-fixing "arrangement,"[10] the Second Amended Complaint is completely devoid of any factual allegations showing such an arrangement or otherwise suggesting a conspiracy, agreement, or concerted action among Defendants.  *See Burtch*, 662 F.3d at 230 (affirming dismissal of the § 1 claim alleging illegal price fixing, illegal group boycott, and unlawful restraint of trade because the complaint "failed to allege direct or circumstantial evidence of an agreement between the Appellees"); *Davis*, 2025 U.S. Dist. LEXIS 118128, *20 (finding that the plaintiffs offered no evidence that the defendant "first agreed with other NAR brokerages to restrain competition before enacting and enforcing the NAR rules in question").

Muhammad similarly fails to provide any factual allegations showing "price-fixing," defining "excessive" or explaining to what "steering" refers.  His vague and conclusory therefore fail to show an unreasonable restraint on trade.  *See J.L. Terre's v. Sherwin-Williams Auto. Finishes Corp.*, No. 02-CV-2645, 2004 U.S. Dist. LEXIS 6411, at *10 (E.D. Pa. Mar. 30, 2004) (dismissing § 1 claim because the allegation that the defendant "engaged in unlawful activities in restraint of trade and commerce in violation of § 1 and § 2 of the Sherman Antitrust Act" was conclusory); *Lenovo United States v. Interdigital Tech. Corp.*, No. 20-493-LPS, 2021 U.S. Dist. LEXIS 56571, at *15-16 (D. Del. Mar. 24, 2021) (dismissing § 1 claim because the allegations of anticompetitive effect were conclusory).  To the extent the § 1 claim is based on this allegedly anti-competitive behavior,[11] it is dismissed.

---

[10]    The Second Amended Complaint also alleges a "tying arrangement," which is discussed separately below.

[11]    To the extent Muhammad's allegations of excessive fees relate to restricting MLS access to NAR members, they are considered as part of the alleged tying arrangement discussed herein.

Muhammad also bases the Sherman Act claim on allegations that Defendants enforced a

policy of restricting access to MLS data based on NAR membership. This alleged policy "is the

agreement itself." *See Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299,

308 (2d Cir. 2023) (holding that if "the plaintiff adequately alleges that the policy or rule is the

agreement itself, then it need not allege any further agreement"); *Davis*, 2025 U.S. Dist. LEXIS

118128, at *4 (adopting the Second Circuit's finding that an alleged anticompetitive policy may

itself be the agreement under § 1).[12]  Thus, the allegations are sufficient to show concerted action

by NAR, PAR, and GLVR.[13]  *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1361

n.20 (5th Cir. 1980) (finding that there was an agreement under the first element of the § 1 claim

based on the plaintiff's allegations that members of an MLS provider restricted access to the

service based on membership criteria); *Relevent Sports, LLC*, 61 F.4th at 308. This Court

liberally construes this allegation as both a tying claim and group boycott claim. *See Reifert*, 450

F.3d at 316 (considering the plaintiff's allegation that the defendants conditioned access to the

MLS on membership in a realtors association as both a tying claim and a group boycott claim).

*But see FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986) (holding that "the category

of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se

approach has generally been limited to cases in which firms with market power boycott suppliers

---

[12]    *But see Eytalis v. Realtors*, No. 7:24-cv-00147-O-BP, 2025 U.S. Dist. LEXIS 140578, at *17 (N.D. Tex. June 9, 2025) (determining that where the NAR sets national policies, which were implemented by the local real estate associations, all of whom were named as defendants, the plaintiff's conclusory allegations of an agreement were insufficient to lead to the inference of an agreement), *adopted by* 2025 U.S. Dist. LEXIS 139498, at *1 (N.D. Tex. July 22, 2025).

[13]    There are no allegations that either individual defendant was a party to, created, or otherwise enforced the policy of restricting access to MLS data based on NAR membership, nor any allegations of concerted action by either Lysaght or Porembo. *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d at 719-20, 746 (dismissing the Hillandale Entities from the § 1 Sherman Act claim because the plaintiff failed to allege that they individually agreed to or participated in the conspiracy).

or customers in order to discourage them from doing business with a competitor -- a situation obviously not present here"); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 815 and n.12 (1st Cir. 1988) ("We are unaware of any federal case that has characterized a multiple listing service as a tying arrangement. . . . Whether it is an unlawful group boycott or an illegal example of price-fixing is a much more complex question."), *cert. denied* 488 U.S. 955 (1988).

"Numerous federal and state courts have declined to hold that an antitrust violation is present where a multiple listing service merely conditions access to the multiple listing service upon membership in a board of realtors." *Venture Res. Grp. v. Greater N.J. Reg'l Multiple Listing Serv.*, No: 95-0401 (MLP), 1995 U.S. Dist. LEXIS 21177, at *8 (D.N.J. Aug. 23, 1995) (citing cases). In *Reifert*, a case in the Seventh Circuit, the plaintiff was a real estate broker who had to pay dues for unwanted membership in a realtors association in order to maintain MLS access. *Reifert*, 450 F.3d 312. The court, applying the rule of reason, concluded that the tying arrangement (realtors association membership for MLS access) did not violate § 1 of the Sherman Act because there was no competition in the tied market nor a substantial effect on interstate commerce.[14] *See id.* at 316-20. In a Fifth Circuit case, *Pope*, the owners of a real estate agency sued NAR, the state agency regulating real estate brokers, and the county board of realtors for boycotting their agency by refusing them MLS access unless they joined the county realtors board. *See Pope v. Miss. Real Estate Com.*, 872 F.2d 127 (5th Cir. 1989). Applying the rule of reason, the court concluded that the requirements were not necessarily anti-competitive

---

[14]    The *Reifert* court also rejected the plaintiff's group boycott claim because there were no exclusionary conditions attached to the realtors association membership and no contention that the cost was prohibitively high. *See Reifert*, 450 F.3d at 320-21. The claim also failed because the plaintiff failed to demonstrate the existence of a competitive market for such memberships. *See id.* at 321.

and that when administered properly "membership requirements serve pro-competitive purposes." *See id.* at 130.  Aside from the board's fee, which was the same for each real estate agent,[15] there were no allegations that any other requirement excluded the plaintiffs from participation on the board or the MLS.  *See id.*  Accordingly, the antitrust claims failed.[16]

"The rule of reason 'presumptively applies' in § 1 cases." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 438-39 (3d Cir. 2023) (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  The rule of reason applies to Muhammad's claim.[17]  *See LifeWatch Servs.*

---

[15]     The membership cost to a company was based on the number of real estate agents in the company.  *See Pope*, 872 F.2d at 130.

[16]     The *Pope* court distinguished its earlier decision in *Realty Multi-List, Inc.*, wherein the United States brought a Sherman Act claim against a corporation ("RML") that operated an MLS because it required members to purchase stock in the corporation and imposed rules prohibiting members from joining any other MLS.  *See Pope*, 872 F.2d at 130 (discussing *Realty Multi-List, Inc.*, 629 F.2d 1351).  In *Realty Multi-List, Inc.*, the "Government's primary concern [was] with the situation in which a properly licensed broker is barred from access to the multiple listing service because RML has determined that he fails to meet its membership criteria or because he cannot afford the membership fee." *Id.* at 1361.  Applying the rule of reason, the court determined that because RML had the requisite power in the market, its "rules must be shown to be justified by the legitimate competitive needs of the association." *Id.* at 1374.  The rules required, *inter alia*, its members (brokers) to have a favorable credit report and business reputation, to have an office open during "customary hours of business," and to purchase one share of stock.  *See id.* at 1381-86.  The court found that there was no "objective criteria for determining a reasonable purchase price" of stock; thus, RML could set a fee unrelated to its costs.  *See id.* at 1385.  It reasoned that a "sizeable membership fee which bears no relation to the cost factors outlined [therein] may not only create a significant barrier to new entry into the association, but may create 'a strong inference that the amount has been set up as a barrier against' new applications." *Id.* at 1386.  The court concluded that because RML's rules were not narrowly tailored to accomplish RML's legitimate competitive needs, summary judgment in favor of RML was not appropriate.  *See id.* at 1389.

[17]     The arrangement is not so plainly anticompetitive that it is considered illegal per se.  *See Realty Multi-List, Inc.*, 629 F.2d at 1361 (concluding that the defendant's rule requiring it to deny MLS access to a properly licensed broker because he fails to meet its membership criteria was not per se illegal); *Davis*, 2025 U.S. Dist. LEXIS 118128, at *32 (holding that the rule of reason applied to the vertical agreement between the defendant and NAR that required NAR members and MLS users to comply with NAR rules).  Nor is the arrangement one on which the courts "have amassed considerable experience with the type of restraint at issue such that [they] can predict with confidence that it would be invalidated in all or almost all instances" to mandate

25

*v. Highmark Inc.*, 902 F.3d 323, 336 n.9 (3d Cir. 2018) (holding that the rule of reason applied to

the group boycott claim because "the per se approach has generally been limited to cases in

which firms with market power boycott suppliers or customers in order to discourage them from

doing business with a competitor," which the plaintiff had not alleged (quoting *Ind. Fed'n of*

*Dentists*, 476 U.S. at 458)); *Realty Multi-List, Inc.*, 629 F.2d at 1367 (holding that the realtor

association's "membership criteria do not warrant per se treatment" and applying the rule of

---

the quick-look approach. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89
F.4th 430, 438-39 (3d Cir. 2023) (internal quotations and citations omitted).

Regardless, Muhammad's tying claim would also fail under the per se analysis.
Applying the per se rule, this Court finds that Muhammad has made the first showing: that the
two products, NAR membership and MLS access, are distinct. *See Reifert*, 450 F.3d at 317
(concluding that access to the MLS is distinct from a realtors association membership). Whether
Muhammad has made the second showing is a close call because his allegations that the MLS is
"essential" for real estate professionals are conclusory. *See Tangent Techs., LLC v. Recycled
Plastics Indus., LLC*, No. 23-C-261, 2024 U.S. Dist. LEXIS 157277, at *32-33 (E.D. Wis. July
24, 2024) (finding that the conclusory allegations without any factual allegations regarding the
relevant market size and the power wielded by party was insufficient to show market power).
*Accord Reifert*, 450 F.3d at 317 (finding that defendant's economic power was shown with
specific allegations that, *inter alia*, the "features and information available through SCWMLS
are not available through any other service" such that "it is impossible to perform the tasks of a
real estate agent or appraiser in the relevant geographic area without using SCWMLS").
Regardless, Muhammad has failed to make the third showing- that a substantial volume of
commerce is affected by the tie- because there are no allegations of a competitor in the market
for services offered by either NAR or GLVR. *See Reifert*, 450 F.3d at 318 ("The district court
found no competition in the allegedly tied market for Realtors Association memberships. Where
there is no competition in the tied market, there can be no antitrust violation."). *See also Gordon
v. Lewiston Hosp.*, No. 1:CV-99-1100, 2001 U.S. Dist. LEXIS 25644, at *70 (M.D. Pa. May 21,
2001) ("A substantial volume of commerce must be foreclosed by a tying arrangement in order
for it to be condemned." (internal quotations omitted)); *Healy v. Cox Communs., Inc. (In re Cox
Enters.)*, 871 F.3d 1093, 1116 (10th Cir. 2017) (finding that "membership in a realtors'
association provides no benefits aside from the ability to use the multiple listing service, so the
markets for those 'products' did not exist"). Muhammad also has not alleged that any other
broker would have become a member of a board other than NAR but for the MLS access tied to
NAR membership. *See Wells Real Estate, Inc.*, 850 F.2d at 815 (dismissing the tying claim
(access to MLS on board membership) because there was no evidence that a substantial volume
of commerce in board membership was foreclosed as the plaintiff "failed to demonstrate the
slightest market for membership in real estate boards that might have been affected by the
defendants' alleged tying arrangement" or "that any other broker would have 'purchased'
membership in any other board but for the power exerted by the lure of the defendants' MLS").

reason to the group boycott claim challenging the "situation in which a properly licensed broker is barred from access to the multiple listing service because RML has determined that he fails to meet its membership criteria or because he cannot afford the membership fee"); *Reifert*, 450 F.3d at 317-21 (applying the rule of reason to the tying claim and group boycott claim, which were based on the requirement that a real estate broker had to become a member in a realtors association in order to maintain MLS access). Muhammad "bears an initial burden under the rule of reason of showing that the alleged . . . agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." *Brown Univ.*, 5 F.3d at 668. "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018).[18] Muhammad has the burden of showing that the arrangement unreasonably restrained competition. *See Jefferson Par. Hosp. Dist. No. 2*, 466 U.S. at 29-31.

"Forcing a buyer to purchase a product he otherwise would not have purchased is insufficient to establish the foreclosure of competition." *See Reifert*, 450 F.3d at 318. Muhammad's allegations of "forced" and "mandatory" membership fees, *see* Sec. Am. Compl. ¶¶ 45, 48, are therefore insufficient. His conclusory allegations of "excessive" fees also do not suffice. *See Iqbal*, 556 U.S. at 678; *Garcia v. Cruz*, No. 2:25-cv-00440-JDW, 2025 U.S. Dist. LEXIS 58113, at *8-9 (E.D. Pa. Mar. 28, 2025) (dismissing antitrust claims based on conclusory

---

[18]    Although Muhammad does not specifically define the relevant markets, a liberal construction of the Second Amended Complaint allows this Court to reasonably infer the relevant product market as the market for real estate association services, and the relevant geographic market as the Commonwealth of Pennsylvania or, alternatively, the greater Lehigh Valley. *See Realty Multi-List, Inc.*, 629 F.2d at 1372 n.39 (Where the defendant, a real estate association, barred access to the MLS unless the broker met its membership criteria, "the relevant product market is the market for residential real estate brokerage services" and "Muscogee County [is] the relevant geographic market"). The analysis and conclusions herein are the same for each geographic market.

allegations).  Further, many of his allegations of "excessive" fees do not pertain to membership costs, but to "excessive fines" and "excessive "penalties" for ethics violations.  *See, e.g.* Sec. Am. Compl. ¶¶ 5, 22, 28.

In the absence of any factual allegations about the cost of NAR membership, how the cost was set, or that the cost was unrelated to maintaining NAR's services or operational costs, Muhammad has failed to show that the cost prohibited him from becoming an NAR member or that the requirement was anticompetitive.  *See Reifert* , 450 F.3d at 320-21 (dismissing the group boycott claim because "no licensed real estate agent was denied access to [the MLS] because of an anti-competitive measure"); *Pope*, 872 F.2d at 130 (concluding that the antitrust tying claim failed because the membership fee for the county board of realtors did not exclude the plaintiffs from participation on the board or the MLS).  *Accord Realty Multi-List, Inc.*, 629 F.2d at 1385-86 (allowing the tying claim to proceed because a "sizeable membership fee which bears no relation to the cost factors [such as the cost of the service and cost of maintaining the service] . . . may create 'a strong inference that the amount has been set up as a barrier against' new applications").  In the absence of such factual allegations, Muhammad's bare conclusory allegation that the requirement "created an artificial barrier to entry, . . . particularly [to] minority-owned businesses and independent brokerages," *see* Sec. Am Compl. ¶¶ 14-15, is also insufficient to show that he was prohibited from becoming an NAR member (on account of race).  *See Iqbal*, 556 U.S. at 678 (holding that conclusory allegations do not suffice to state a § 1 claim); *Garcia*, 2025 U.S. Dist. LEXIS 58113, at *8-9 (dismissing antitrust claims based on conclusory allegations).  Muhammad has therefore failed to sufficiently allege that the membership requirement to access the MLS imposed an unreasonable restrain on trade.  The § 1 claim is dismissed.

2.        Section 2- monopolization

The § 2 monopolization claim fails because Muhammad has not alleged sufficient facts to show that NAR, PAR, or GLVR had monopoly power.[19]  "[M]onopoly power may be proven through direct evidence of supracompetitive prices and restricted output.  It may also be inferred from the structure and composition of the relevant market."  *Broadcom Corp.*, 501 F.3d at 307 (internal citations omitted).  "To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has [1] a dominant share in a relevant market, and that [2] significant entry barriers protect that market.  Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices."  *Id.* (internal quotations and citations omitted).  "Proving the existence of monopoly power through indirect evidence requires a definition of the relevant market."  *Id.* ("The scope of the market is a question of fact as to which the plaintiff bears the burden of proof. . . . Failure to define the proposed relevant market in these terms may result in dismissal of the complaint.").

Muhammad has not alleged the existence of direct evidence,[20] nor has he alleged the existence of indirect evidence of *both* the association Defendants' dominant share in the relevant market and that significant entry barriers protect that market.  *See id.*  The relevant market can be

---

[19]      For the reasons previously stated, this Court, liberally construing the Second Amended Complaint, finds allegations of concerted action between NAR, PAR, and GLVR, only.  There are no allegations of concerted action by or monopoly power regarding either Lysaght or Porembo.  *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d at 700 (dismissing § 2 monopolization claim against individual member defendants because there was no claim for concerted monopolization under Section 2, and the amended complaint contained no allegations regarding the monopoly power of the individual member defendants).

[20]      Muhammad does not allege either supracompetitive prices or restricted output.

gleaned from a liberal construction of the Second Amended Complaint.[21]  The pleadings do not specify Defendants' market share, but do allege that "NAR controls millions [of] real estate professionals, with 1.5 million forced into membership to access the MLS."  Sec. Am. Compl. ¶ 9.  The Second Amended Complaint also defines PAR as the "state affiliate of the NAR" and the GLVR as the "regional MLS controlling real estate listings and access."  *Id.* at ¶ 4.  In his opposition brief, Muhammad further alleges that "NAR controls approximately 1.5 million of the 2 million real estate professionals in the United States."  *See* Resp. 1.  This Court recognizes that statements in a brief are not allegations for purposes of deciding a Rule 12(b)(6) motion; nevertheless, this Court, which has the authority to allow Muhammad to amend his pleadings, considers whether the statement would be sufficient to show that NAR "ha[d] a dominant share in a relevant market."  *See Broadcom Corp.*, 501 F.3d at 307.  It would be.  *See FTC v. AbbVie Inc.*, 976 F.3d 327, 371 (3d Cir. 2020) ("A court can infer market power from a market share significantly greater than 55 percent.").  Regardless, Muhammad failed to also plead "high barriers to entry" in the relevant market.  *See Harrison Aire, Inc.*, 423 F.3d at 381 ("Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry.").

---

[21]    As mentioned in footnote 18 *supra*, the pleadings, when liberally construed, define the relevant product market as the market for real estate association services, and the relevant geographic market as the Commonwealth of Pennsylvania (or alternatively the greater Lehigh Valley).

Muhammad alleges essentially two[22] barriers to entry in the relevant market: (1)
financial, and (2) compliance with ethics and NAR rules.[23]  *See* Sec. Am Compl. ¶¶ 14, 15, 22,
45.  As to the first, although a barrier to entry may be shown if a real estate association's
membership fee is not related to its costs,[24] the Second Amended Complaint makes no such
allegation.  Muhammad's conclusory allegations of "excessive fees," *see* Sec. Am Compl. ¶ 12,
are insufficient to show a barrier to entry into the NAR, let alone a "significant" barrier.  *See*
*Schuylkill Health Sys. v. Cardinal Health 200, LLC*, No. 12-7065, 2014 U.S. Dist. LEXIS
103663, at *37 and n.15 (E.D. Pa. July 30, 2014) (dismissing the monopolization claim because
the plaintiff, alleging "high fixed costs, high risk of failure in the business development process,

---

[22]    Although Muhammad also alleges barriers to the market for MLS, this is not the relevant
market because Defendants are real estate associations.  *See* footnotes 18 and 21 *supra*. *Accord*
*Thompson v. Metro. Multi-List, Inc.*, No. 1:88-cv-2883-RLV, 1990 U.S. Dist. LEXIS 14487, at
*4-5 (N.D. Ga. June 28, 1990) (finding that where the defendant, a multiple listing service,
barred access unless the broker purchased membership in a board of realtors, "the relevant
product market is the market for multiple listing services").  Accordingly, Muhammad's
allegation that "requiring real estate agents to be NAR members to gain access to MLS data,
Defendants have created an artificial barrier to entry," *see* Sec. Am. Compl. ¶ 14, does not
support a monopolization claim.  Moreover, to the extent the relevant market should be
considered the MLS market, Muhammad's conclusory allegations would fail for the same
reasons discussed herein as to the real estate association market.

[23]    Muhammad also makes bare conclusory allegations of an "artificial barrier to entry, . . .
particularly [to] minority-owned businesses and independent brokerages," *see* Sec. Am Compl.
¶¶ 14-15, which do not suffice.  *See St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 66 (3d Cir.
2009) (affirming the district court, which noted that the plaintiff's allegation that the defendants
"'effectively barricaded entry into the market' . . . was too conclusory to be sufficient under
*Twombly*); *Synthes, Inc. v. Emerge Med., Inc.*, 2012 U.S. Dist. LEXIS 140251, *40 (E.D. Pa.
Sept. 28, 2012) (dismissing the antitrust claim because the plaintiff's "bare allegations" of
monopoly power were insufficient); *Eytalis*, 2025 U.S. Dist. LEXIS 140578, at *12-13 (finding
that "conclusory statements like '[p]laintiff and similarly situated brokers are subject to
excessive and unjustified fees due to the forced memberships...,' and '[d]efendants' enforcement
of these dues policies disproportionately affects minority brokers and independent agencies,'"
were too vague to plead am antitrust injury).

[24]    *See Realty Multi-List, Inc.*, 629 F.2d at 1386 ("A sizeable membership fee which bears no
relation to the cost factors outlined above may . . . create a significant barrier to new entry into
the association . . . .")

and difficult regulatory hurdles," pled only "conclusory assertions regarding high barriers to entry"). His allegations of "excessive" and "punitive" fines, fees, and penalties, *see* Sec. Am Compl. ¶¶ 5, 8, 12, 22, 28, 37, are similarly conclusory. *See Iqbal*, 556 U.S. at 678 (holding that conclusory allegations do not suffice to state a claim). Muhammad has also failed to allege how fines and penalties, which are apparently related to ethics violations, created a financial barrier to *entry* in the market. "Further, it has been recognized by courts that it is essential to the meaningful operation of any multiple listing service to require participants to adhere to certain professional and ethical standards." *Venture Res. Grp.*, 1995 U.S. Dist. LEXIS 21177, at *9-10. No ethical rules of NAR are identified in the Second Amended Complaint; rather, the only specifically alleged rule is that requiring NAR membership to obtain MLS access. *See generally* Sec. Am. Compl. Muhammad's conclusory allegation that Defendants' "monopolistic rules" created a barrier to entry, *see* Sec. Am Compl. ¶ 14, is therefore insufficient. *See Schuylkill Health Sys.*, 2014 U.S. Dist. LEXIS 103663, at *37 and n.15 (dismissing the monopolization claim because the plaintiff, had "not sufficiently pleaded any relevant factors other than conclusory assertions regarding high barriers to entry").

Moreover, even if Defendants had monopoly power in the market, the allegations do not show that they willfully acquired such power through anticompetitive conduct. The alleged anticompetitive conduct is "restricting MLS access to NAR members, imposing excessive fees and fines to eliminate competition and engaging in steering to maintain an unfair market advantage." *See* Sec. Am. Compl. ¶ 12. As to the latter, this Court previously explained that Muhammad failed to explain to what he was referring by "steering" and that such conclusory allegations do not suffice. *See Iqbal*, 556 U.S. at 678 (holding that conclusory allegations do not suffice to state an antitrust claim); *Garcia*, 2025 U.S. Dist. LEXIS 58113, at *8-9 (dismissing

antitrust claims based on conclusory allegations).  Similarly insufficient are his allegations about

fines, which apparently relate to ethics violations, not competition.  Muhammad makes only

conclusory allegations of "excessive" fees and fails to specify the price of NAR's membership

fee, show that it was prohibitive, or that it was unrelated to NAR's costs.  Muhammad also

makes only conclusory allegations that brokers, none of whom are identified, were forced out of

business because of the need to become an NAR member to access the MLS.  *See, e.g.* Sec. Am.

Compl. ¶ 15 ("Many real estate professionals, particularly minority-owned businesses and

independent brokerages, face financial barriers and are forced out of the industry due to the

burdensome costs and restrictive requirements imposed by Defendants.").  To the extent that

Muhammad alleges that he was "forced" to surrender his license, it appears that this was because

of ethics "complaints" and "charges" and not because of the need to become an NAR member to

access the MLS.  *See id.* ¶¶ 28, 40, 47.  The Second Amended Complaint therefore fails to allege

facts showing that restricting MLS access to NAR members was anticompetitive.  *See Realty*

*Multi-List, Inc.*, 629 F.2d at 1386 (concluding that membership criteria that is not "reasonably

necessary to the accomplishment of the legitimate goals and narrowly tailored to that end . . .

[has] an anticompetitive effect which has no countervailing procompetitive benefit").  In fact,

courts have found that restricting access to MLS by requiring persons to pay a membership fee to

join a real estate association is not anticompetitive conduct; rather, it promotes competition.  *See*

*Findling v. Realcomp II, Ltd.*, No. 17-CV-11255, 2018 U.S. Dist. LEXIS 47082, at *6-7 (E.D.

Mich. Mar. 22, 2018) (explaining that when the defendant restricted MLS access to those who

paid a membership fee to join a realtor association, this promoted competition because MLS

"provid[ed] consumers with aggregated, streamlined information"); *see also Realty Multi-List,*

*Inc.*, 629 F.2d at 1368 ("Certainly the antitrust laws must allow reasonably ancillary restraints necessary to accomplish these enormously procompetitive objectives.").

The § 2 monopolization claim is dismissed.

### 3.      Section 2- attempted monopolization

The attempted monopolization claim fails as to PAR, GLVR, Lysaght, and Porembo because "Section 2 does not provide for a conspiracy to attempt to monopolize claim" and there are no allegations that any Defendant, except NAR, "had a dangerous probability of achieving monopoly power."  *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d at 700 (dismissing the § 2 attempted monopolization claim against individual member defendants because conspiracy did not apply and the plaintiffs "failed to allege that any of the individual member defendants had a dangerous probability of achieving monopoly power").  The attempted monopolization claim against NAR fails because, for the reasons preciously discussed, Muhammad does not sufficiently allege that NAR "engaged in predatory or anticompetitive conduct."  Additionally, Muhammad has failed to allege facts showing that NAR had a specific intent to monopolize or a dangerous probability of achieving monopoly power.

"In proving specific intent, a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominantly motivated by legitimate business aims.'"  *Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 260-61 (3d Cir. 1984) (quoting *Times Picayune Publishing Co. v. United States*, 345 U.S. 594, 627 (1953)).  "Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct."  *Pa. Dental Ass'n*, 745 F.2d at 261.  "[W[hen business conduct is 'not related to any apparent efficiency,'" specific intent may be

inferred.  *See Phila. Taxi Ass'n*, 886 F.3d at 341 (quoting *Aspen Skiing Co.*, 472 U.S. at 608 n.39)).  Muhammad does not allege the existence of direct evidence of specific intent.  Aside from bare conclusory allegations, which do not suffice, he also fails to allege facts from which specific intent may be inferred.  *See Petrochem Insulation v. United Ass'n of Journeymen & Apprentices of the Plumbing Pipe Fitting Indus., Local Union No. 38*, No. 92-15511, 1993 U.S. App. LEXIS 25194, at *3 (9th Cir. Sep. 24, 1993) (holding that "conclusory allegations are insufficient in the absence of anticompetitive conduct from which such specific intent may be inferred").  As previously discussed, Muhammad does not sufficiently allege anticompetitive conduct, nor provide any factual allegations to show that the cost of membership was not related to business services or other legitimate business reasons.[25]  *See Phila. Taxi Ass'n*, 886 F.3d at 341 (finding no specific intent to monopolize because the defendant Uber's choice to distinguish itself from other vehicles-for-hire by avoiding medallions, which were required for taxicab services in Philadelphia, could be reasonably viewed as motivated by the desire to operate more efficiently and to acquire customers).

Muhammad also fails to allege a dangerous probability of achieving monopoly power.[26] The Third Circuit has "held, in the context of a § 2 claim for attempted monopolization, that a complaint must allege 'something more' than mere market share, such as 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand.'"  *Broadcom Corp.*, 501 F.3d at

---

[25]    "Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power."  *See Phila. Taxi Ass'n*, 886 F.3d at 339.

[26]    *See Pa. Dental Ass'n*, 745 F.2d at 261 ("Absent evidence of specific intent, we need not reach the question of whether Blue Shield's market share constitutes a 'dangerous probability of success.'").

317 (quoting *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141

(3d Cir. 1998) (internal quotation marks omitted)).  Courts may consider each factor, and "[n]o

single factor is dispositive." *Broadcom Corp.*, 501 F.3d at 318.   Ignoring his bare conclusory

allegations, Muhammad has not alleged anything more than market share.[27]  As previously

discussed, the Second Amended Complaint includes only conclusory allegations about

anticompetitive conduct and barriers to entry.  It also fails to allege or identify any competitors in

the relevant market, let alone include allegations regarding the strength of the competition.

Muhamad has therefore failed to show that NAR had a dangerous probability of achieving

monopoly power.  *See Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112-14 (3d Cir. 1992)

(concluding that "despite [the defendant's] approximate 50% market share, the other factors

showed that [it] did not have a dangerous probability of success in any attempt to monopolize the

[relevant] market" because, *inter* alia, the barrier to entry was "not insurmountable," there was

no showing of a reduction in the number of manufacturers in the relevant market, and there was

no showing that any competitor was forced out by the defendant's conduct).

Consequently, the attempted monopolization claim is dismissed, and Count I is dismissed

in its entirety.

**C.    The Fair Housing Act claim is dismissed.**

Liberally construed, Muhammad's FHA claim is based on disparate treatment and

disparate impact.  Under a disparate treatment theory, intentional discrimination may be shown

through factual allegations "that some discriminatory purpose was a 'motivating factor' behind

the challenged action."  *Cmty. Servs., Inc.*, 421 F.3d at 177 (quoting *Cmty. Hous. Tr.*, 257 F.

---

[27]    Even market share allegations are absent from the Second Amended Complaint, but are
included in Muhammad's brief in opposition to the Motion to Dismiss.

Supp. 2d at 225)).  Intentional discrimination "may be alleged through direct or indirect

evidence." *El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 842 (E.D. Pa. 2018).  Direct

evidence must show that "decisionmakers placed substantial negative reliance on an illegitimate

criterion in reaching their decision." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir.

1998).  "In the absence of direct evidence of discriminatory intent, the court must apply burden-

shifting standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[28]  *See*

*United States v. Branella*, 972 F. Supp. 294, 298 (D.N.J. 1997).  In contrast, a disparate impact

claim does not require a showing of discriminatory intent; instead, courts look to whether the

conduct had a "'racially discriminatory effect,' i.e., whether it disproportionately burdened a

particular racial group so as to cause a disparate impact." *Mt. Holly Gardens Citizens in Action,*

*Inc.*, 658 F3d at 381 (quoting *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 130 (3d Cir. 1977)).

"Typically, a disparate impact is demonstrated by statistics." *Mount Holly Gardens Citizens in*

*Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (internal quotations

omitted).

    To the extent Muhammad's claim is based on a disparate treatment (intentional

discrimination) theory, it fails because he has not alleged facts to show that Defendants' conduct

was motivated by race.  Muhammad does not allege the existence of any direct evidence of

intentional discrimination.  *Accord El*, 315 F. Supp. 3d at 842 (finding that the plaintiff alleged

sufficient facts to show direct evidence of intentional discrimination where the defendant

---

[28]    Under the *McDonnell Douglas* paradigm, the plaintiff first has the burden of proving a
prima facie case of discrimination by a preponderance of the evidence.  *See McDonnell Douglas
Corp.*, 411 U.S. at 802.  If proven, the burden then shifts to the defendant to articulate some
legitimate, nondiscriminatory reason for its action.  *See id.*  If satisfied, the plaintiff has the
opportunity to prove by a preponderance of the evidence that the legitimate reasons asserted by
the defendant are in fact mere pretext.  *See id.*

allegedly told the plaintiff, in response to his inquiry as to why he and his wife had not "received the keys at the ribbon-cutting ceremony" like the other tenants, that the defendant "is really a Christian-based non-profit organization and so does not care to have folks of Islamic religion inside of their programs nor the recipients of any of the Artists Lofts"). Additionally, he does not allege any facts showing indirect evidence of intentional discrimination. Instead, his allegations are conclusory.[29] Such allegations are insufficient to state an FHA claim for disparate treatment/intentional discrimination. *See May v. Erie Cty.*, No. 1:24-cv-277, 2025 U.S. Dist. LEXIS 132414, at *32 (W.D. Pa. July 11, 2025) (dismissing the FHA claim because the complaint failed to provide sufficient factual content and, instead, relied on conclusory allegations of discrimination); *Rosado v. Whitcraft*, No. 23-CV-3717, 2023 U.S. Dist. LEXIS 224332, at *20 (E.D. Pa. Dec. 15, 2023) (concluding that the plaintiff did "not allege sufficient facts from which one could infer that a discriminatory purpose was a motivating factor behind the challenged actions"); *Subh v. Sec. Guard, Inc.*, No. 23-1462 (RMB-EAP), 2023 U.S. Dist. LEXIS 216817 (D.N.J. Dec. 6, 2023) (dismissing the discrimination claim based on a disparate treatment theory because the plaintiff "offers only conclusory allegations that he was consistently treated less favorably than employees outside his protected class").

To the extent his claim is based on a disparate impact theory, the only policy identified in the Second Amended Complaint is that requiring brokers to obtain NAR membership to access the MLS. *See Kaluszyner v. Bank of N.Y.*, No. 19-14777 (FLW) (DEA), 2020 U.S. Dist. LEXIS

---

[29]    *See* Sec. Am. Compl. ¶ 22 ("Plaintiff and other minority real estate professionals were subjected to disparate enforcement of ethics complaints and penalties. While white real estate professionals were given leniency for similar or more serious offenses, Plaintiff faced excessive penalties, unjust fees, and was eventually coerced into almost relinquishing agents license."), ¶ 26 (alleging Defendants "selectively enforced their rules based on race"), ¶ 43 (alleging that "minority professionals, including Plaintiff, faced targeted penalties and discrimination").

56824, at *16 (D.N.J. Mar. 25, 2020) ("To assert an FHA claim under a disparate impact theory, a plaintiff must identify policies that are facially neutral yet discriminatory in effect." (citing *Lapid-Laurel, L.L.C.*, 284 F.3d at 467)).  However, the allegations of disparate impact in this regard are wholly conclusory.  *See, e.g.* Sec. Am. Compl. ¶ 15 ("Many real estate professionals, particularly minority-owned businesses and independent brokerages, face financial barriers and are forced out of the industry due to the burdensome costs and restrictive requirements imposed by Defendants.").  Muhammad does not allege any facts, such as statistics, showing how frequently minority brokers were allegedly forced out of business, or otherwise unable to obtain NAR membership, when compared to white realtors.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.").  Additionally, as previously discussed, the allegation of financial barriers, such as "excessive" fees, are wholly conclusory.  *See Wilson v. Hillsborough Twp. Constr. Dep't*, 779 F. App'x 969, 972 (3d Cir. 2019) ("Vague, conclusory speculations that [the defendant's] decisions were made for a discriminatory reason are insufficient to state a claim under the FHA.").  Consequently, Muhammad has failed to state an FHA disparate impact claim.  *See Oxford Invs., L.P. v. City of Phila.*, 21 F. Supp. 3d 442, 457 (E.D. Pa. 2014) (finding that the FHA disparate impact claim failed because the plaintiff "offers nothing more than unsupported assertions to support its disparate impact claims" and fails to allege "statistics demonstrating statistical disparities in variances granted by Defendants").

The FHA claim, Count II, is dismissed.

### D.    The civil rights claims are dismissed.

Count III of the Second Amended Complaint asserts civil rights violations, which arise from alleged race discrimination during Muhammad's ethics proceedings, pursuant to 28 U.S.C. §§ 1981 and 1983.  *See* Sec. Am. Compl. ¶¶ 24-29.[30]  Count IV, also arising from Muhammad's ethics proceedings, alleges substantive and procedural due process violations.  *See id.* ¶¶ 30-34 (contending Defendants deprived Muhammad "of his property rights, professional reputation, and ability to work in real estate").[31]  Broadly construed, Count IV also asserts a violation of the Equal Protection Clause.  *See id.* ¶ 35.[32]

Because the Constitutional Amendments do not create a cause of action, Count IV, as pled, would fail as a matter of law.  *See Mahan v. Miller*, No. 23-4021, 2024 U.S. Dist. LEXIS 163263, at *4 (E.D. Pa. Sep. 11, 2024) (holding that the federal Constitutional "Amendments do not create a cause of action; they only create rights").  However, in light of Muhammad's pro se status, this Court construes Count IV as asserting a claim for violations of due process and equal

---

[30]    Count III alleges Defendants "impos[ed] harsher penalties than similarly situated non-minority professionals;" "unfairly targeted [Muhammad] in disciplinary proceedings, whereas similarly situated white real estate professionals engaged in more severe or comparable conduct but were not penalized or received significantly lighter consequences;" ignored the NAR Code of Ethics "and selectively enforced their rules based on race;" "sought to charge him even after the complainant declined to appear at the ethics hearing;" and "subjected [him] to a disproportionately heavy-handed approach, excessive fines, and forced license surrender" compared to white agents.  *See* Sec. Am. Compl. ¶¶ 24-29.

[31]    The due process claims are for allegedly denying Muhammad "a fair hearing by filing charges after a complainant withdrew and acting beyond regulatory authority in revoking a license;" for charging him "with ethics violations even after the original complainant declined to appear or provide evidence" and "proceed[ing] with disciplinary actions without an independent review or basis for the charges;" for applying "rules and penalties in an inconsistent and retaliatory manner to punish [him] for speaking out against discriminatory practices;" and for handling his ethics case "with extreme severity, while other similarly situated real estate professionals faced lenient treatment for more severe infractions."  *See* Sec. Am. Compl. ¶¶ 30, 33-34.

[32]    The equal protection claim in Count IV is for Defendants' alleged "arbitrary targeting of individuals through selective enforcement of regulations."  *See* Sec. Am. Compl. ¶ 35.

protection pursuant to 42 U.S.C. § 1983. *See id.* ("To enable individuals to enforce the rights created by the Constitution, Congress enacted 42 U.S.C. § 1983 as a federal cause of action. . . . Since Plaintiff is proceeding pro se, the Court will construe the Complaint as asserting claims under 42 U.S.C. § 1983 for violation of his Fifth and Eighth Amendment rights."). Because § 1983 has different requirements than a claim under § 1981, and because the allegations in Counts III and IV are substantially similar, Count III is construed as having been brought under § 1981 only. In evaluating the sufficiency of each count, the Court considers all allegations in these counts and in the Second Amended Complaint.

### 1.    Section 1981

Muhammad's § 1981 claim fails because the Second Amended Complaint does not allege sufficient facts to show that Defendants intended to discriminate based on race. Muhammad "must prove discriminatory intent to establish a 42 U.S.C. § 1981 claim. Intent may be demonstrated through disparate impact, departures from procedural norms, a history of discriminatory actions, and other relevant facts." *Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977)). At the motion to dismiss stage, discriminatory intent does not have to be proven, but facts must be alleged "that raise a reasonable expectation that discovery will reveal evidence of [it]." *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019). "Conclusory allegations of generalized racial bias do not establish discriminatory intent." *Flagg*, 806 F. Supp. at 1223.

Muhammad's allegations of discrimination[33] are conclusory and unsupported by any facts. *See Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 716-18 (3d Cir. 2012) (concluding

---

[33]    *See* footnotes 29-31 *supra*

that the plaintiff failed to allege a plausible claim under § 1981 because the amended complaint

failed to allege any facts supporting the conclusion that the defendant's acts were motivated by

discrimination on the basis of race); *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 821-22

(E.D. Pa. 2017) (finding that the plaintiff failed to allege any facts in support of his conclusory

allegations that the defendant discriminated against him during disciplinary proceedings).  The

mere suggestion that Muhammad faced harsher penalties and treatment compared to "similarly

situated" brokers, *see* Sec. Am. Compl. ¶¶ 24-25, fails to state a claim.  *See Rosero v.

Penhorwood*, No. 1:23-CV-1898, 2025 U.S. Dist. LEXIS 107497, at *36-37 (M.D. Pa. June 6,

2025) (dismissing the § 1981 claim, which was based on allegations that the plaintiff "was

treated differently than similarly situated white persons," because such "boilerplate conclusions"

failed to state a claim); *Williams v. Wells Fargo Bank, N.A.*, No. 16-1003, 2016 U.S. Dist.

LEXIS 107338, at *3-4, 11-12 (D.N.J. Aug. 9, 2016) (concluding that the plaintiff's "conclusory

blanket statement, that [the defendant] had provided prime loans with lower interest rates to

similarly situated white borrowers were insufficient to establish a § 1981 claim).  The Second

Amended Complaint does not offer any facts regarding the respective ethics complaints,

penalties, or brokers.  *See Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011)

("[T]o be considered similarly situated, comparator[s] must be similarly situated in all relevant

respects."); *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 (3d Cir. 2010) (affirming

dismissal of discrimination claims where the plaintiff "did not provide any characteristics of

those individuals who received the promotions to which she alleges she was entitled").

Muhammad's conclusory allegations of "disparate enforcement of ethics complaints and

penalties," *see* Sec. Am. Compl. ¶ 22, are similarly insufficient.  *See Gross*, 487 F. App'x at 718

(finding that the plaintiff's assertion that the defendant "'knowingly subjected him to disparate

treatment ... because he is a minority' is nothing more than a legal conclusion couched as a factual allegation, which, under Rule 8, is insufficient to defeat a motion to dismiss"); *Surjeet Bassi v. Mount Airy, No. 1. LLC*, No. 3:23-cv-550, 2024 U.S. Dist. LEXIS 135008, at *12-13 (M.D. Pa. July 31, 2024) (finding that mere allegations of "disparate treatment" are conclusory); *Jordan v. Staffing Plus, Inc.*, 315 F. Supp. 3d 844, 847 n.16 (E.D. Pa. 2018) (concluding that the plaintiff's allegations that the defendant "has a pattern and practice of disparate treatment and discrimination against nonwhite employees" were nothing more than conclusory statements). The Second Amended Complaint also offers no factual allegations to support the conclusions that Defendants acted "based on race" and "targeted" minorities.[34]  *See McNeal v. State Farm Fire & Cas. Co.*, No. 24-cv-03146, 2024 U.S. Dist. LEXIS 199613, at *8 (E.D. Pa. Nov. 4, 2024) (dismissing the § 1981 claim because the plaintiff's allegations that the defendant wrongfully refused to pay his insurance claim because he is Black was "based on conclusory factual allegations that do not set forth the essential elements of a claim required to survive a motion to dismiss"); *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 U.S. Dist. LEXIS 166940, at *20-23 (E.D. Pa. Oct. 10, 2017) (finding that the plaintiff's allegations that the defendant applied its policies against him "because of his race" were conclusory and did not show an intent to discriminate on the basis of race as required to satisfy a §1981 claim).

Consequently,[35] the § 1981 claim, Count III, is dismissed.

---

[34]    *See* Sec. Am. Compl. ¶¶ 26, 43

[35]    This Court also questions whether Muhammad engaged one or more of the activities enumerated in § 1981. *See Herring v. Gorbey*, No. 17-278, 2017 U.S. Dist. LEXIS 194557, at *12 (E.D. Pa. Nov. 27, 2017) (finding that the defendant's alleged filing of a disciplinary complaint against the plaintiff to intimidate her from filing an appeal did not concern activities enumerated in § 1981).  Although Muhammad alleges that he spoke "out against discriminatory practices," *see* Sec. Am. Compl. ¶ 34, there are no factual allegations as to what he said, when this occurred, or whether Defendants were aware of the same.  *See Fleet v. CSX Intermodal, Inc.*, No. 17-3562, 2018 U.S. Dist. LEXIS 120256, at *36 (E.D. Pa. July 18, 2018) (finding that the

2.    **Section 1983**

The § 1983 claim, alleging a violation of due process and equal protection, fails because there is nothing in the Second Amended Complaint to suggest that Defendants were state actors. *See Grigsby v. Kane*, 250 F. Supp. 2d 453, 460 (M.D. Pa. 2003) (dismissing § 1983 claim because the plaintiff failed to allege facts showing that Pennsylvania Association of Realtors acted under the color of state law "either by being employed by the Commonwealth, or through any nexus between them and any named state actor").[36]  Additionally, the Second Amended Complaint does not allege state action.  *See Schlesinger v. S.F. Ass'n of Realtors*, No. 21-cv-03648-RS, 2021 U.S. Dist. LEXIS 209456, at *13 (N.D. Cal. Oct. 29, 2021) (concluding that the plaintiff failed to allege that the actions of the San Francisco Association of Realtors was state action, thereby failing to state a claim under 42 U.S.C. § 1983).  There are no allegations to suggest that Defendants were acting in concert with state officials or that the state insinuated itself into a position of interdependence with Defendants.  The only allegations that Defendants exercised powers that are traditionally the exclusive prerogative of the state relate to licensing. However, the allegations as to Defendants' powers in this regard are contradictory and conclusory.  *Cf.* Sec. Am. Compl. ¶ 37 (". . . Defendants used their control over MLS access, real estate licensing . . . ."), *with* ¶ 38 ("Defendants misrepresented their authority, falsely claiming

---

plaintiff's call to an ethics hotline constituted protected activity under § 1981); *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, No. 3:11-617, 2012 U.S. Dist. LEXIS 115594, at *39 (M.D. Pa. Aug. 16, 2012) (dismissing the § 1981 claim because the complaint failed to allege that the defendant knew that the plaintiffs had spoken out against the alleged discriminatory actions).

[36]    *See also* Const. Amend. 14 ("No *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added)); *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 308 (2023) ("The Equal Protection Clause operates on States. It does not purport to regulate the conduct of private parties.").

they had the power to revoke Plaintiff's real estate license, forcing him to return it under duress .

. . .").  Also contradictory are Muhammad's allegations as to what happened with his license.  *Cf.*

Sec. Am. Compl. ¶ 8 (". . . Defendants "attempt/actual to coerce Plaintiff [sic]. . . into returning

his license . . . ."), *with* ¶ 22 (Defendants "coerced [him] into almost relinquishing agents license

. . . ."), *with* ¶ 49 (". . . Plaintiff suffered financial losses due to restricted MLS access and

revoked license . . . .").  "If the Court were required to accept contradictory inferences and

conclusory allegations as well-pleaded facts, then Rule 12(b)(6) review would be nothing more

than the Court alchemizing legally insufficient statements into a plausible cause of action."

*Reginella Constr. Co. v. Travelers Cas. & Sur. Co. of Am.*, 971 F. Supp. 2d 470, 475 (W.D. Pa.

2013).

       Even if the allegations were sufficient to show state action, the § 1983 claim relates to the

ethics proceedings and does not arise from a policy, custom, or practice.  As previously

discussed, the allegations of disparate and discriminatory treatment are conclusory and therefore

insufficient to show a practice or custom.[37]  *See Taylor*, 2025 U.S. Dist. LEXIS 105606, at *16-

17 (determining that the plaintiff's allegation that the defendant "has a policy/custom of

screening out or ignoring credible reports by African-American individuals, especially in private

complaint filings and  child welfare investigations . . . is conclusory and insufficient to plausibly

state a claim"); *Khan v. City of Paterson*, No. 17-5006, 2019 U.S. Dist. LEXIS 61247, at *9

(D.N.J. Apr. 9, 2019) (finding that the plaintiffs' conclusory allegations of polices, customs, and

practices did not allege sufficient facts that plausibly pled a policy or custom).[38]  Because

---

[37]    The only policy identified in the Second Amended Complaint is that requiring brokers to become NAR members to access the MLS, which is unrelated to the § 1983 claim.

[38]    The conclusory allegations in *Khan* included the following: "Defendants' custom and practice is to permit discrimination and harassment based on the Muslim BOA member's association with a particular religion, ethnicity, or culture;" "it was the custom and practice of

Muhammad's allegations are all made against Defendants collectively, any suggestion of a policy or practice is even weaker and, also, fails to show personal involvement. *See Blackstone*, 2024 U.S. Dist. LEXIS 159911, at *5-6 (dismissing § 1983 claims where all allegations were made against "Defendants" collectively).

Moreover, for the reasons previously explained, Muhammad has failed to plead the existence of purposeful discrimination to state an equal protection violation. His allegations about comparators are also insufficient. *See Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) ("An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were 'similarly situated.' Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" (quotations omitted)). The conclusory allegations are also insufficient to show a due process violation. *See Horsey v. Mason*, No. 4:24-CV-00825, 2024 U.S. Dist. LEXIS 224698, at *7 (M.D. Pa. Dec. 12, 2024) (concluding that the substantive due process claim was meritless where the allegations that the plaintiff "was denied parole because he is black and not white" were conclusory); *Smith v. V.I. Hous. Auth.*, No. 2009-0011, 2016 U.S. Dist. LEXIS 60227, at *16 (D.V.I. May 6, 2016) (finding that to the extent the plaintiff's procedural due process violations arise from the denial of an "opportunity to be heard" the conclusory allegation lacks any factual underpinning and fails to state a claim).

The § 1983 claim, Count IV, is dismissed.

---

the City to hide alleged wrongful conduct of various employees of the Defendants and non-Muslim [Board] members;" "it was the custom and practice of the Defendants to clear the non-Muslim [Board] members of all charges and to not discipline the wrongdoers, but instead punish the Muslim [Board] members." *See Khan*, 2019 U.S. Dist. LEXIS 61247, at *9-10 (finding that the plaintiffs' conclusory allegations of polices, customs, and practices did not allege sufficient facts that plausibly pled a policy or custom).

E.    **The UTPCPL claim is dismissed.**

The Second Amended Complaint asserts a UTPCPL claim based on the allegation that

"Defendants misrepresented their authority, falsely claiming they had the power to revoke

Plaintiff's real estate license, forcing him to return it under duress."  *See* Sec. Am. Compl. ¶ 38.

It also alleges that:

> Defendants made false and misleading representations regarding their rules and
> procedures, including:
>      [1] Publicly advertising MLS as an "open and fair marketplace", while
> internally maintaining barriers that prevent minority professionals from competing
> equally.
>      [2] Stating that all NAR members receive equal treatment, while in practice,
> minority professionals, including Plaintiff, faced targeted penalties and
> discrimination.
>      [3] Misleading members by claiming MLS participation is optional, when
> in reality, it is a mandatory requirement for professionals to conduct business,
> constituting a form of forced membership and unlawful tying arrangement.

*Id.* ¶¶ 41-44.  The Second Amended Complaint asserts that Defendants "refusal to allow MLS

access without forced NAR membership is a direct violation of Pennsylvania's laws against

restraint of trade and deceptive business practices," and as "a direct result of these unfair and

deceptive practices, Plaintiff suffered financial losses due to restricted MLS access and revoked

license, severe reputational damage, making it difficult to re-enter the industry and emotional

distress and economic hardship from being coerced out of his profession. . . ."  *Id.* ¶¶ 48-49.[39]

Initially, this Court finds that Muhammad lacks standing to bring a UTPCPL claim.  The

statute provides: "Any person who purchases or leases goods or services primarily *for personal,*

*family or household purposes* and thereby suffers any ascertainable loss . . . may bring a private

action to recover actual damages. . . ."  73 Pa. Stat. Ann. § 201-9.2 (emphasis added).

---

[39]     There are other allegations in this Count that are not based on fraudulent or deceptive
conduct, which are not mentioned herein.  *See* 73 Pa. Stat. Ann. § 201-2(4)(i)-(xxi) (listing the
conduct declared unlawful by the UTPCPL).

Muhammad's claims all relate to his broker's license and/or the services Defendants provided to his work as a real estate professional. Such services are not for personal, family or household purposes. *See My Space Preschool & Nursery, Inc. v. Capitol Indem. Corp.*, No. 14-2826, 2015 U.S. Dist. LEXIS 31667, at *12 (E.D. Pa. Mar. 13, 2015) ("When an insurance policy is purchased to provide coverage to a business, courts in Pennsylvania have consistently found that plaintiffs lack standing to assert a claim under the UTPCPL.").

Regardless of whether he has standing, Muhammad has failed to state a claim under the UTPCPL. Because his claim is based on allegations of deceptive practices, as opposed to fraud, this Court applies the less restrictive requirements of the deceptive practice theory to analyze his claim. *See Sacks*, 2013 U.S. Dist. LEXIS 7824, at *19. The claim fails because Muhammad failed to allege facts showing that Defendants' conduct or statements were deceptive.[40]

Muhammad's allegations of deceptive conduct are conclusory. He alleges that "Defendants misrepresented their authority, falsely claiming they had the power to revoke Plaintiff's real estate license. . . ," *see* Sec. Am. Compl. ¶ 38, but there are no factual allegations explaining how they misrepresented their authority or in what context. Similarly absent from Muhammad's allegation that "Defendants made false and misleading representations regarding

---

[40]    Whether Muhammad's allegations sufficiently show justifiable reliable and damages is a close call in light of the conclusory nature of the allegations. To the extent Muhammad's allegations of justifiable reliance and damages are based on anything other than him allegedly being forced to return his license based on Defendants' alleged representation that they had the authority to revoke the license, *see* Sec. Am. Compl. ¶ 38, he has failed to sufficiently allege justifiable reliance or damage. *See Hunt*, 538 F.3d at 227 (affirming dismissal of the UTPCPL claim because the plaintiff did not adequately allege that he justifiably relied on the defendant's deception- that the defendant's deception induced him to purchase the defendant's products or engage in any other detrimental activity); *Ober*, 2020 U.S. Dist. LEXIS 67397, at *9-10 (dismissing the UTPCPL claim because the plaintiffs did not plead any facts supporting their alleged losses and refusing "to accept conclusory boilerplate language as true on a motion to dismiss").

their rules and procedures. . . , *see id.* ¶ 41, are any factual allegations describing how these misrepresentations were made and what Defendants said or did.  Such conclusory allegations of deceptive conduct are insufficient to state a claim.  *See Edwards v. Monumental Life Ins. Co.*, No. 17-5260, 2017 U.S. Dist. LEXIS 203003, at *9 (E.D. Pa. Dec. 11, 2017) (dismissing the UTPCPL claim where the plaintiff pled conclusory statements that the defendant "'engag[ed] in fraudulent or deceptive conduct which created the likelihood of confusion or misunderstanding' without alleging facts of [the] deceptive conduct and [the plaintiff's] justifiable reliance on its deceptive conduct").  Furthermore, much of the allegedly deceptive conduct is based on behavior that is itself supported by only conclusory allegations, as has been explained previously.  *See id.* ¶¶ 42-43 (alleging that Defendants maintained "barriers that prevent minority professionals from competing equally" and "minority professionals, including Plaintiff, faced targeted penalties and discrimination").

The UTPCPL claim, Count V, is dismissed.

**F.      Leave to amend is denied.**

For all the reasons discussed herein for dismissing the claims and because Muhammad has already had multiple opportunities to amend his pleadings to state a claim, but failed, and was specifically warned when given leave to file a second amended complaint that he would not be given further leave to amend, *see* ECF No. 47, dismissal of all claims is with prejudice.[41]

---

[41]      This Court finds that further leave to amend would be futile.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that a court may deny leave to amend if a complaint is vulnerable to 12(b)(6) dismissal, if an "amendment would be inequitable or futile"); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (holding that leave to amend may be denied "based on . . . repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment").

Having dismissed all claims against the named Defendants, John Does 1-10 are also dismissed. *See Phillips v. Superintendent Chester SCI*, 739 F. App'x 125, 131 (3d Cir. 2018) ("Once the District Court dismissed all of the claims against the named defendants, this claim against the Doe Defendants could not proceed. *See Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998)").

## V.    CONCLUSION

The Second Amended Complaint is based on only conclusory allegations of antitrust violations, unfair business practices, and race discrimination. It fails to even allege state action to support the Constitutional violations. Because conclusory allegations are insufficient to state a claim, and for the reasons specifically discussed herein as to the elements of each of the claims, the Motion to Dismiss is granted.

A separate order will be issued.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge